**FIRST STATE BANK OF CORPUS CHRISTI, Appellant,**

v.

**VON BOECKMANN–JONES COMPANY, Appellee.**

No. 10982.

Court of Civil Appeals of Texas.

Austin.

June 27, 1962.

Rehearing Denied July 18, 1962.

Clark, Thomas, Harris, Denius & Winters, Mary Joe Carroll, Austin, for appellant.

Cofer & Cofer, Douglass D. Hearne, Austin, for appellee.

HUGHES, Justice.

This is a venue case in which appellee, Von Boeckmann-Jones Company, seeks to sustain venue in Travis County of its suit against appellant corporation, the First State Bank of Corpus Christi, under subdivisions 7 and 23 of Art. 1995, Vernon's Ann. Civ.St.

Subdivision 7 provides, in part, that in all cases of fraud, suit may be brought in the county where the fraud was committed, and subdivision 23 provides, in part, that suits against a private corporation may be brought in the county in which the cause of action or part thereof arose.

The cause of action asserted by appellee is based on fraud. It is our opinion that venue of this suit was properly laid in Travis County under both subdivisions 7 and 23, supra.

The plea of privilege filed by appellant to be sued in Nueces County was overruled.

In November, 1959, appellee made a contract with Thankmar Welker, Jr. by which appellee agreed to print and bind a "1961 Oil and Gas Industries Directory".[1] The appellant Bank was advancing funds to Mr. Welker to enable him to compile data for the directory. The Bank "approved" appellee's contract and "assured" it that the cost of printing the directory would be paid. Appellee commenced printing the directory and by September 6, 1960, had expended about $6,800.00 in so doing. During this period of work on the directory appellee was

1. The amount owing on the contract at the time of this hearing was $22,721.65. The total cost was $25,884.90.

"given the impression" by Mr. W. S. Byrnes, Vice President of appellant Bank, that there were sufficient orders for the directory in possession of the Bank to pay the debt of Mr. Welker to the Bank as well as for the cost of printing the directory. On July 11, 1960, as testified by Mr. Frank Evans, Secretary for appellee, Mr. Byrnes told Mr. Evans that the Bank had sufficient collateral to pay the account of appellee.

On August 19, 1960, Mr. Werner Jessen, appellee's President, wrote the Bank as follows:

"It is our understanding with Mr. Welker that your bank is holding the signed bonafied orders for an Oil Directory which Mr. Welker is having us print. Mr. Welker assured us yesterday that he had sufficient signed orders in your possession to take care of all expenses pertaining to our part of printing this directory. He also told us he would talk to you on Monday, the 22nd, regarding our visit and have you give us a letter acknowledging this arrangement and assuring us that our total cost of producing this directory will come out of Mr. Welker's account first.

"As our cost of doing this Directory will be approximately $20,000.00 we would like to know the total number of signed bonafied orders you are holding and to whom the payment of these orders is made out."

No reply was made by the Bank to this letter, at least not before the telephone conversation of September 6, 1960. On this day Mr. Kent Rider, Vice President of appellee corporation, in Austin, Travis County, placed a telephone call for and talked with Mr. W. S. Byrnes, appellant's Vice President, in Corpus Christi in Nueces County.

The representations made by Mr. Byrnes during this telephone conversation constitute the sole basis for appellee's suit based on fraud.

Present in appellee's office on September 6, with Mr. Rider when he made the telephone call to Mr. Byrnes were Mr. Welker, Mr. Evans and Mr. Jessen. Just prior to this call Mr. Rider stated to Mr. Welker, " * * * We needed to come into my office and discuss whether or not we would continue with this contract, or whether we would terminate it here, because it was much easier to lose what we already had in it than to continue on and complete the contract and be worse off."

We now quote from the testimony of Mr. Rider regarding this call:

"A When Mr. Byrnes came on the phone and identified himself as W. S. Byrnes—I believe are his initials—I told him my name and my position with the Von Boeckmann-Jones Company, and that at that instant, on September 6, 1960, seated around my desk were Mr. Thankmar Welker, Mr. Frank Evans, and Mr. Werner Jessen, and that the purpose of my call was to determine how much in the way of signed orders for collateral were being held by his bank, the First State Bank of Corpus Christi, Texas, for the Von Boeckmann-Jones Company as an assist to retiring the obligation of Thankmar Welker.

"Q And what did Mr. Byrnes reply?

"A Mr. Byrnes replied that at that time there was something in excess of $36,000—I believe the figures were $36,-360, in signed, approved, accepted orders from Thankmar Welker in the First State Bank, but of this amount $21,000 approximately were being held by the bank to retire Thankmar Welker's obligation to the First State Bank of Corpus Christi, Texas.

"Q And what about the balance,— what did Mr. Byrnes say was being done—was specifically being done by his bank, if anything, with the balance of those accounts?

"A That $15,360 were being held for the Von Boeckmann-Jones Company.

"Q Did you say anything to Mr. Byrnes on the occasion of that September 6, 1960, phone call about the present position of the Von Boeckmann-Jones Company with regard to continuing under that contract?

"A Yes. That unless we had an assurance that there were orders being held for us on assignment or as collateral, that as of that date and as of that hour, on September 6, 1960, that we would do no more work toward the completion of the 1961 Oil and Gas Directory.

"Q You made this statement to Mr. Byrnes?

"A I did, sir."

Mr. Rider also testified that relying upon the information given him by Mr. Byrnes the printing and binding of the directory was completed.

The testimony of Mr. Rider did not go undisputed. Appellant contends that its Mr. Byrnes was talking about two kinds of orders in his conversation with Mr. Rider (1) a signed bona fide order assigned to the Bank as collateral for its debt and (2) an unsigned, unassigned list of orders which were "earmarked" as security for appellee. We quote from the testimony of Mr. Byrnes:

"A My recollection of the call, Mr. Rider stated that Mr. Welker was in his office, and he had called to determine whether or not Mr. Welker had brought a list of some $15,000—verified the fact that Welker had brought a list to the bank that they had requested Welker to do.

"Q What type of list?

"A A list of $15,000 of accounts.

"Q Well, what did you say?

"A I told him that—oh, I think Mr. Rider at the time also wanted to know what his indebtedness was to the bank and what collateral was there in the bank. And I told him we had this list that Mr. Welker brought in and that we also had some $21,000 in collateral on our note, which consisted of some $18,000 in signed orders that were assigned to us on assignment, and I think I told him that we had an insurance—assignment of insurance policies, about thirty-five or thirty-eight hundred dollars.

* * * * * *

"Q What did you tell him about the list that he referred to, if anything?

"A I don't recall telling him anything particularly about the list, except the fact that Mr. Welker had brought that list to the bank and left it there.

"Q Now, what exactly did that list consist of, Mr. Byrnes?

"A The list in itself was many pages, and my recollection of the accounts, they were small accounts, and it was just the names and amounts. There were no invoices and no orders with the list. It was not a verified list.

"Q Did you tell Mr. Rider it was a verified list or an unverified list?

"A I believe I told him it was an unverified list."

Appellant also contends that the following testimony of Mr. Rider is substantially the same as that of Mr. Byrnes:

"A * * * Mr. Byrnes told me that he had in the First State Bank of Corpus Christi accounts totalling $36,-360.

"Q Did he say he had assignments of those accounts? He just said he had orders, didn't he?

"A I can't answer the question, whether he said orders or assignments, Mr. Harris.

"Q Yes, sir. As a matter of fact, he did tell you that certain of those accounts were actually assigned to the bank, didn't he?

"A No. He told me that $21,000 of those accounts were being held by the Bank for the retirement of Welker's obligation to the bank.

"Q Yes, sir. All right, sir. Now, did he tell you what Welker owed the bank?

"A Approximately $21,000 as of September 6, 1960."

Appellant also emphasizes testimony to the effect that appellee did not request the Bank to prepare an assignment of the directory accounts to it.

Similarly, appellant points to testimony tending to show that even after September 6 appellee continued to look to Mr. Welker to secure it in the payment of the directory costs. We do not detail this testimony, but we do set out the content of a letter sent to Mr. Jessen and written by Mr. Byrnes dated September 28, 1960, as follows:

"In connection with various telephone calls and your letter of August 19, 1960, we wrote Mr. Thankmar Welker on September 3, 1960, concerning your letters and the conversations with Mr. Evans. In our letter to Mr. Welker on September 3, 1960, it was our understanding that the contract was for $18,250.00 and that your company was to furnish him an advertising copy so that he might proceed with his billings.

"In our letter of September 3, 1960, which contained suggestions not pertaining to this contract we stated the following:

" 'We, of course, cannot assure your publisher that the total cost of printing this directory will come out of your account first. We naturally hold assignments on the accounts for a sufficient amount to liquidate the indebtedness to us. It is apparent from the information we have in our files, based on the assignments, and the list we were furnished, that you have approximately a total of $34,000.00 in order.'

"At this time we have assignments on some $18,000.00 in orders and our files reflect a list of approximately $15,000.00 in orders which are not being held by the bank under assignment in our collateral files which we understand from Mr. Welker are ear marked for your purposes.

"As of this date Mr. Welker advises us that he has orders for advertising and directories amounting to $36,-000.00."

Appellant vigorously argues that this letter clearly distinguishes between the Bank's assignments of $18,000.00 and a list of orders of approximately $15,000.00 being held in the Bank's file and understood by the Bank to be "earmarked" for appellee. In pursuing this point, appellant quotes the following testimony of Mr. Jessen:

"Q (By Mr. Harris, resuming) You have in your hand Defendants' Exhibit No. 3. Now, will you read the last paragraph of that? Now, that is a letter addressed to you, isn't it?

"A Yes, sir. 'At this time we have assignments on some $18,000.00 in orders and our files reflect a list of approximately $15,000.00 in orders which are not being held by the bank under assignment in our collateral files which we understand from Mr. Welker are ear marked for your purposes.'

"Q Well, now, did you notice any distinction or two categories there that Mr. Byrnes was making, that there were $18,000 of assignments of accounts to secure the payment of the obligation of the bank, and in addition a list of accounts which Mr. Welker says are being earmarked for your purposes,— did you notice any distinction in the two categories there, sir?

"A No, sir, not knowing exactly what assignments or orders are—what the difference in assignments or orders are, I couldn't answer that one.

"Q But it does set out there that there are two different things there, aren't there?

"A Yes, sir."

The record shows that the directory was printed, bound, and delivered by appellee to Mr. Welker and that from the assigned directory orders held by the appellant Bank it obtained sufficient funds to pay in full the indebtedness of Mr. Welker to the Bank, but that of the $25,884.90 cost of printing the directory, appellee has been paid only $2,200.00.

The appellant Bank did not have any collateral pledged to the payment of appellee's account. We quote the testimony of its Mr. Byrnes:

"Q It is a fair statement to say of your testimony, Mr. Byrnes, that the First State Bank of Corpus never at any time from October 1959, until March of 1961 held in its possession or in its collateral files signed, bona fide orders which would be used to pay off Welker's account to the Von Boeckmann-Jones Company?

"A That is correct."

The nature of the representation made by the Bank through Mr. Byrnes in the telephone conversation of September 6, 1960, is a subject of legitimate dispute. Did Mr. Byrnes represent that the Bank was holding merely a list of directory orders, or did he represent that the Bank was holding as collateral for the payment of the directory costs bona fide signed orders of the same quality which it held for its own protection?

In support of the judgment of the Trial Court we assume that the Trial Court resolved this fact issue in favor of appellee. This implied finding is fully supported by the evidence.

It is our opinion that the three essential elements of actionable fraud are present and proved in this case. These elements are: (1) a false representation of a material fact (2) reliance thereon by a person entitled to rely thereon (3) resultant injury. See 25 Tex.Jur.2d p. 626.

The second element of the cause of action for fraud, or reliance, occurred wholly in Travis County. The directory was completed in Travis County at a cost of some $19,000.00 following the telephone conversation of September 6, 1960. This was done in reliance upon the representation that the Bank was holding the described collateral for the account of appellee.

Sec. 23, supra, is applicable to sustain venue in Travis County provides only that a "part" of the cause of action "arose" in the county of suit. In Savage v. H. C. Burks & Co., 270 S.W. 244, Dallas Civil Appeals, it was held that "A cause of action, as that term is used in the venue statute, consists both of the right of plaintiff and the injury to such right. It embraces the entire state of facts that give rise to an enforceable claim, and necessarily comprises every fact which a plaintiff must prove in order to obtain judgment."

Appellee was required to prove its reliance on the misrepresentation of appellant in order to prove a cause of action for fraud. This "reliance" occurred in Travis County and, therefore, in our opinion, a part of appellee's cause of action arose in Travis County.

We, also, are of the opinion that the misrepresentation emanating from the September 6, 1960 telephone conversation was made in Travis County and that fraud, under subd. 7, supra, was committed in such county. It is true that Mr. Byrnes was speaking from Corpus Christi, but his voice was heard in Austin. Direct authority for this conclusion is Hayter v. Hudgens, 236 S.W. 232, Texarkana Civil Appeals. The Court there held that a defendant speaking over the telephone from Nacogdoches to the plaintiff in Rusk County committed fraud in Rusk County under the fraud exception of the venue statute saying, "We do not see that the fact that the

offer was made by Hayter (defendant) over the telephone made it any less an offer to appellee in Rusk County than it would have been if Hayter had gone in person to Rusk County and there made it to appellee. The offer was not made to appellee until it reached him, and when it reached him he was in Rusk County." Mr. Byrnes made no misrepresentation to Mr. Rider until Mr. Rider heard it, and when he heard it he was in Travis County.

It is wholly immaterial, in our judgment, that the telephone call was placed by Mr. Rider, and the reverse situation was presented in Hayter v. Hudgens. If Mr. Byrnes did not desire to communicate with appellee via the telephone, he should have refrained from its use. He did not originate, but he acquiesced in the use of the telephone for the purpose of mutual communication. The scientific marvel of the telephone is unaffected by which party initiates its use.

The order appealed from is affirmed.

Affirmed.